# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

PAUL MOORE,

      Petitioner,

      v.

WARDEN, *Indiana State Prison*,

      Respondent.

CAUSE NO. 3:15-CV-577-TLS-MGG

## OPINION AND ORDER

Paul Moore, a prisoner without a lawyer, filed a habeas corpus petition to challenge his conviction and sentence for two counts of murder, two counts of criminal confinement, and one count of arson under Case No. 49G02-308-MR-12884. Following a jury trial, on May 5, 2004, the Marion Superior Court sentenced Moore to one hundred twenty years of imprisonment.

## FACTUAL BACKGROUND

In deciding this habeas petition, the Court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> The facts most favorable to the convictions indicate that Moore's mother purchased a .45–caliber Ruger handgun in 2001 and kept it at Moore's home in the 4300 block of East 39th Street in Indianapolis. On the afternoon of January 25, 2002, Indianapolis Police Department Sergeant David Wisneski responded to a report of a burglary in progress at the home of Linda Jordan. Sergeant Wisneski heard the yelling of gang names and saw an unidentified person push Linda aside and forcibly enter her home. Yonic Jordan then forcibly removed someone from the home. After the situation calmed down, Sergeant Wisneski learned that Derrick Dempsey had lost a fight with Yonic and had driven to the Jordan residence with Moore and a third person "to seek revenge." Sergeant Wisneski asked Dempsey if he could "look inside" his car, which was parked in the driveway with the engine running. Dempsey consented.

In the trunk, Sergeant Wisneski found an assault rifle and a shotgun. A records check indicated that Moore had reported these firearms stolen. Under the front passenger seat, Sergeant Wisneski found a "chrome and black" .45–caliber Ruger handgun, which had not been reported stolen. Moore stated that he owned the handgun and produced a valid handgun permit. Sergeant Wisneski made no arrests but confiscated the firearms "because things were in a very, very dangerous state at that time."  Sergeant Wisneski sent the firearms to the police property room. On January 28, 2002, as part of his duties in operating the Integrated Ballistic Identification System ("IBIS"), firearms technician John Brooks test-fired the confiscated handgun and entered the relevant ballistics information into the IBIS computer. In April 2002, Moore's mother retrieved the handgun from the property room and gave it to Moore.

Late one night in June 2003, Moore telephoned Eric Bettis, the uncle of his friend Curtis Ward, and asked for a ride. Eric complied, and Moore gave him $30. The next morning, Moore informed Eric that he had left his gun in the car. Eric's wife, Theresa, stopped by Moore's residence to give him the gun, but he was not at home. Theresa gave the gun to Eric's brother, Herman Bettis, because she did not want to keep it in her car. Herman informed Moore that he had the "black and silver" .45–caliber handgun, and Moore told him to "hang on to it." Herman kept the handgun in his restaurant.

On the evening of Friday, July 18, 2003, Adrian Beverly was riding around with Brandie Coleman and Gregory Johnson, who was dressed as a female and went by the name of Nireah. The trio saw Moore and Ward riding in Moore's car and asked them to pull into a gas station parking lot. Johnson and Moore exited their vehicles, talked briefly, and exchanged phone numbers. Johnson hugged Moore and kissed him on the cheek.  Moore was attracted to Johnson. Coleman and Ward also exchanged phone numbers.

On July 21, 2003, Herman Bettis delivered the handgun to Moore at his home. At 12:51 a.m. on July 23, 2003, Coleman called Moore's home phone to speak with Ward. Coleman and Johnson then drove to Moore's home in Coleman's mother's Jeep Grand Cherokee. Coleman, Johnson, Ward, and Moore chatted briefly outside and entered Moore's home. Ward and Coleman went into Ward's room, and Moore and Johnson went into Moore's room.

Later, Moore entered Ward's room with a "black and gray" Ruger .45–caliber handgun and said, "Man, I need to holler at you." The two men went into the kitchen, and Moore asked Ward whether he knew "if Nireah is a man or a female." Ward told the "disturbed" and "upset" Moore that Nireah looked like a woman to him. Moore and Ward went into the living room, where Moore "interrogated" Johnson and Coleman regarding whether Johnson was male or female. After approximately forty minutes of questioning, Johnson had to use the restroom. Moore followed him there and exclaimed in a "stunned, startled" voice, "Man, this is a boy." Moore became "real irate" and talked about feeling "like his

2

manhood's been violated." Moore stated that Johnson "was kissing on him." Moore stated that he should "whip their ass" or "possibly kill them ." Moore asked Johnson, "What did you think, I was a faggot?"

Moore asked Ward to get some wire, which they used to bind Coleman's and Johnson's hands behind their backs. Johnson sobbed that he "didn't mean nothing" and would "never do nothing like that again" and "turn straight." Moore put Coleman and Johnson in the backseat of the Jeep and told Ward to follow him in Ward's car. Moore drove the Jeep from East 39th Street to a small park on Fall Creek Parkway North Drive, where he drove over a curb, around a locked gate, and into a wooded cul-de-sac. Ward drove past the gate, made a U-turn, and returned to see Moore walking up the road. Moore entered Ward's car, took the handgun out of his pocket, dismantled it, and threw the pieces out the window. Moore said, "Man, I had to do it." Moore told Ward that he had to "calm [Coleman] down" after he shot Johnson. The pair went back to Moore's home, returned a roto-rooter to a rental store, and went their separate ways.

That afternoon, Moore called Ward and stated that "he might have to go back and burn the truck up." Ward later spoke with Moore's brother, Clarence McGee, who had seen the bodies in the Jeep. McGee asked Ward to pick him up at Moore's home so that "they could go burn the Jeep up." Ward arrived at Moore's home after dark. Moore told Ward that the Jeep had to be burned to "cover his tracks." McGee asked Ward to get a gas can, and the two men drove back to the Jeep. Ward let McGee out of the car near the Jeep, made a U-turn, and retrieved McGee, who smelled of gasoline and said that he had almost burnt himself. Ward saw that the Jeep was in flames. Upon their return, Moore described how Johnson "flopped back in the seat" when he was shot. Moore told Ward that he was like a brother and that "if anything goes down that they wouldn't have anything to worry about."

Just after 9:00 p.m., firefighters were dispatched to the burning Jeep and extinguished the flames. Inside, they discovered the charred bodies of Johnson and Coleman, both of whom had been fatally shot in the forehead before the fire started. Coleman's larynx and chest had suffered blunt force trauma. The .45–caliber bullets recovered from the victims' skulls matched the January 2002 ballistics test of Moore's handgun. Investigators determined that gasoline had been poured in the backseat of the Jeep and ignited. On July 29, 2003, Adrian Beverly identified Ward as the passenger in the car that she had seen in the gas station parking lot on July 18 while riding with Coleman and Johnson. Ward initially denied any involvement in the crimes but eventually implicated Moore.

On August 5, 2003, the State charged Moore with two counts of murder, two counts of class B felony criminal confinement, and one count of class B felony arson. Moore and McGee were tried together in April 2004. On April 8, 2004, the jury found Moore guilty as charged. On May 5, 2004, the trial court imposed an aggregate sentence of 120 years.

Op. "Moore v. State" 4-6, ECF No. 4-6 (published as *Moore v. State*, 827 N.E.2d 631, 634–36 (Ind. App. 2005).

Moore argues that he is entitled to habeas corpus relief. He asserts that the prosecution deprived him of due process by failing to disclose a plea agreement with Curtis Ward and for knowingly presenting his false testimony at trial. He further asserts that he received ineffective assistance of counsel because trial counsel did not present his grandfather as a witness and that the State court erred by finding that the introduction of ballistics evidence obtained in violation of the Fourth Amendment was harmless error.

## STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal quotations and citations omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (internal quotation marks and citations omitted). Criminal defendants are entitled to a fair trial, but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision*." Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotations and citations omitted).

## ANALYSIS

### A.        Prosecutorial Misconduct

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution*." Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *U.S. v. Bagley*, 473 U.S. 667, 676 (1985) (internal quotations and citations omitted). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotations and citations omitted).

Moore argues that he is entitled to habeas relief because the prosecution failed to disclose an agreement with Curtis Ward, a key trial witness, and that the prosecution knowingly elicited false testimony from Ward regarding the agreement. "The Supreme Court has clearly established that a prosecutor's knowing use of perjured testimony violates the Due Process Clause." *Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999). "When the defendant argues that the government

allegedly used perjured testimony, to warrant setting the verdict aside and ordering a new trial, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001).

At the outset of the investigation, the police suspected both Moore and Ward of committing the murders. Trial Tr., 388:7–8. The prosecution decided to use Ward as a witness against Moore and Clarence McGee. *Id.* 388, 434-96. The prosecution charged Ward with criminal confinement, arson, and assisting a criminal, but did not charge him with murder. *Id.* 396:14–15. The prosecution also agreed to reduce Ward's bond from $250,000 to $25,000 and required continued contact with the prosecution as a condition of his release. Post-Conviction Relief Hr'g Tr., 14-17 (referencing the transcript for Ward's bond hearing).

On January 28, 2004, the trial court held a pretrial conference, and Moore's trial counsel represented as follows:

> **Trial Counsel:** Also, Judge, in a roundabout way, [Ward] is on probation looking at a three-year backup, picks up this case here -- Curtis Ward's charged also -- and in essence with his statement and cooperation with the State of Indiana, he has basically confessed to what his involvement, alleged involvement, is. So we're looking at a conviction on Mr. Ward which then in turn reverses or subjects him to a violation of that probation. But yet Mr. Ward is out on bond through an agreement with the State of Indiana.
>
> **The Court:** It wasn't my agreement though, I can tell you that, because you know what -- I set my bonds at $250,000 on those, so . . .
>
> **Trial Counsel:** And, Judge, basically reviewing that file, at first Mr. Ward's bond was no bond, you then set it at two hundred and fifty, and then on September the 5th, it was, by agreement, his bond miraculously dropped down to fifteen thousand.

Trial Tr. 26.

Two months later, at trial, trial counsel provided the following opening statement:

[The prosecution], the State of Indiana, intends to call thirty-six witnesses during the course of the next three days, please pay attention to each and every one of them. However, as Mr. Staples has eluded to for the length -- the majority of his opening argument, there's one individual by the name of Curtis Ward. Curtis Ward is interviewed by the State of Indiana to the detectives on July 30th, 2003. In that first interview, Curtis Ward denies any knowledge involving the deaths of Mr. Johnson and Ms. Coleman. That interview, according to Det. Gullion, takes about an hour or so. Mr. Ward, after that interview, is then let go. One important thing comes out of that interview and you'll hear from the detective that, during the course of that hour plus time, the detectives, using what they conveniently call "interview techniques," I call it "lying," plant in the mind of Curtis Ward that Paul Moore has pointed the finger at Curtis. They'll tell you Paul never said a thing like that. So they let Curtis go, and Curtis, over the course of the next thirteen days, develops a story, he also hires an attorney and he comes back to the detectives of the State of Indiana on August 6, 2003, and, after negotiations with the State of Indiana and striking what they call a "gentleman's handshake," which I call "you scratch my back, I'll scratch your back," Curtis Ward starts telling a story implicating Paul Moore. I'm not going to go into the details of it because I'm going to tell you the truth, he's now denied everything on July 30, now he comes back on August 6th with this story. This is after the deal with the State and you'll hear about the benefit that he has received and possibly could still receive for this cooperation.

* * *

Please pay attention to all of the evidence, but you watch those TV shows -- a "star witness," in my opinion -- Curtis is their star. Remember the cookie jar when you go to deliberate. Thank you, ladies and gentleman.

*Id.* 103-04; 105–06.

Ward testified for the prosecution as their sole eyewitness of the events immediately preceding and following the murder of the victims. Moore's trial counsel cross-examined him as follows:

**Trial Counsel:** Mr. Ward, you made an interesting comment, you're trying to protect yourself, correct?

**Ward:** Yeah.

**Trial Counsel:** The statement and something about you being on probation right now, correct?

**Ward:** Correct.

**Trial Counsel:** What was that for again?

**Ward:** Gun charge.

**Trial Counsel:** Gun charge. Out of what courtroom, sir?

**Ward:** I'm not sure. It might be three, two. I'm not sure.

**Trial Counsel:** Isn't it a fact that it's out of this courtroom?

**Ward:** Possible, yeah.

**Trial Counsel:** And did you know what your bond was set in regards to your probation violation?

**Ward:** No.

* * *

**Trial Counsel:** Would you doubt or know different if I was to tell you your original bond, in regards to just the probation violation, was $250,000?

**Ward:** I'm not sure.

**Trial Counsel:** You're not sure. Your lawyer never told you anything about that?

**Ward:** The whole total bond was $250,000?

**Trial Counsel:** Right.

**Ward:** Initially, yeah.

**Trial Counsel:** Yeah. Okay, so you do know that. Do you know what bond your family posted to release you?

**Ward:** I don't know the exact amount.

* * *

**Trial Counsel:** Do you have reason to doubt me if I told you based on an agreement between you, your lawyer and the State of Indiana your bond was reduced from $250,000 to $15,000?

8

**Ward:** You're asking me would I disagree?

**Trial Counsel:** Yeah. Do you know different to that or am I telling you wrong?

**Ward:** No, I do not.

**Trial Counsel:** Uh-huh. So simple mathematics, based on the agreement between you, your lawyer and the State, there's a reduction, by agreement, of $235,000, fair enough mathematics?

**Ward:** Yeah.

**Trial Counsel:** Now, you have been free on that bond since when?

**Ward:** October of last year.

**Trial Counsel:** You got out in October?

**Ward:** Yeah.

**Trial Counsel:** Okay. Do you know what your backup time, if the Court finds you in violation of your probation?

**Ward:** I don't know exactly.

* * *

**Trial Counsel:** You are looking at -- and I don't know the exact numbers -- but I know it's over one thousand days backup time. Fair enough?

**Ward:** Fair enough.

**Trial Counsel:** Roughly three years, you understand?

**Ward:** Yeah.

**Trial Counsel:** And you're out on bond facing that, correct?

**Ward:** Yeah.

**Trial Counsel:** Has anyone, your lawyer in particular, ever explained to you based on his past experiences, the policies or the actions of this Court on probation violations?

**Ward:** No, sir.

**Trial Counsel:** Okay. But you are trying to protect yourself, correct?

**Ward:** That was initially.

*Id.* 496-99. On redirect, the prosecution asked Ward whether he been promised anything in

exchange for his trial testimony. He responded, "No, I haven't." *Id.* 538–39.

Moore's trial counsel also addressed this issue during closing arguments:

[Ward] is truly to protect himself. [The prosecution] referred to how he has
received a benefit already about the bond, yes, he has. I don't know if you're
curious but reading of the charges he's facing, oops, [Ward] is not charged with
murder. And from this deal, there's no writings. It's a gentleman's handshake.
After we finish here today, what's going to happen? Do you know? I don't. As far
as I know, [Ward's] charge is dismissed. Who knows? I don't. Yes, he has a lot to
gain, he is doing a wonderful job protecting himself.

*Id.* 982.

At the post-conviction stage, the prosecuting attorney testified at an evidentiary hearing

as follows:

Q: Okay. So that -- so [Ward's] bond reduction was based on an understanding
that you'd reached with [Ward's counsel] that he would cooperate with the State -
- Mr. Ward would cooperate with the State.

A: It wasn't the basis but it was a -- and I hate to use a colloquialism -- a chit in
the game, if you will.

Q: And that -- that request as a condition of the bond was granted by the Court, is
that correct?

A: According to the transcript, yes.

* * *

Q: So if Mr. Ward didn't cooperate with that condition, his bond would be
revoked. Is that your recollection after reading the transcript?

A: Yes. Judge Altice says: If either of these gentlemen come back in here and tell
me that you have not stayed in touch with them then I'm going to revoke your
bond. Yes.

* * *

10

**Q:** Do you recall if you had said we're working towards an agreement in this matter with Mr. Ward?

**A:** Do I recall saying -- yes, I probably did say -- well, let me look.

**Q:** Page seven, line eight.

**A:** Yes . . . I had been meeting with [Ward's counsel]. I'd been talking with [Ward's counsel], and that's what we were doing.

**Q:** Do you – do you recall stating that you were working towards an agreement but you haven't -- you haven't got it reduced to writing yet?

**A:** Yes.

**Q:** And then if – once – once you would utilize Mr. Ward's statement, you'd use him to testify against Mr. McGee and Mr. Moore, is that correct?

**A:** That was the plan, yes.

* * *

**Q: . . .** Mr. Ward received two separate bond reductions in this case that we discussed earlier and those were based on the understanding that he would be a State witness, he had to cooperate with the State. Under *Brady*, do you believe that that should have been disclosed to the defense?

**A:** Well, your -- your question assumes something that's not entirely true. We didn't reduce the bond because he was a witness; we reduced bond because we were negotiating with his attorney regarding whether or not he was going to be a witness. So like I -- I said earlier I used the term, and I wasn't making light of the proceedings, it was a chit in the game. . . . to [Ward's counsel]: Fine, I'll agree to a reduced bond, that'll let you know I'm talking to you in good faith. You know, tell your guy he needs to get on the team or he can be sitting over there with Moore and McGee. You know, what's it going to be? It was that kind of back and forth. So that wasn't something I had to reveal, I suppose. It was just the way things were going.

Post-Conviction Relief Hr'g Tr., 17-20; 23–24.

On cross-examination, the prosecuting attorney testified:

**Q:** At the time that Mr. Ward testified in Mr. Moore's trial, did he have a plea agreement?

11

**A:** As I recall, he did not.

**Q:** At the time that he testified, would it be true to say that you had not completed negotiations with Mr. Ward regarding what his ultimate plea agreement was going to be or if he was going to plead guilty at all?

**A:** That -- that is true, yes.

**Q:** But it would be fair to say, would it not, that there had been discussions . . . leading up to that?

**A:** Discussions were ongoing, yes.

* * *

**Q:** . . . to the best of your recollection, what was -- what should have been [Mr. Ward's counsel's] understanding of his client's legal situation at the point that he testified?

**A:** That he could either hurt himself or help himself if he told the truth about what happened and that he could utilize that in negotiating with us with regard to a sentence on his pending charges.

*Id.* 31–33.

Ward also testified at the post-conviction relief hearing:

**Q:** Okay. But your testimony today is that there was no -- there was no understanding or agreement or promises made between you and the State prior to you testifying at trial?

**A:** No promises that I could grab on hold to. There was no specifics at all. None. No specifics, no details, no nothing.

* * *

**Q:** Now you recall meeting with Bridget Rogers, correct?

**A:** Yes.

**Q:** Okay. Prior to **--** in 2010, you met with Ms. Rogers. Now did Ms. Rogers ask you at that time if you had any agreements with the State?

**A:** Yeah, see, right here. It says -- I mean, it says that she asked.

**Q:** Okay. Did she ask you if it was an unsaid agreement, a wink and a nod?

**A:** Right.

**Q:** And what did you tell her?

**A:** Yes.

**Q:** And is your testimony today that you had a wink and a nod, an unsaid agreement with the State?

**A:** I'm saying yes but no specifics, no details. I knew nothing. Totally blind. That's what I'm telling you.

*Id.* 110–12.

The Court of Appeals of Indiana rejected the failure to disclose material evidence claim, finding that the prosecution had reached no agreement with Ward. *See* Mem. Decision on Post-Conviction Relief 8-14, ECF No. 4-13. The appellate court further found that trial counsel and the jury were aware of the understanding between the prosecution and Ward that Ward's trial testimony would likely result in a more favorable plea agreement. *Id.* 11–12 ¶ 16. The appellate court also rejected the claim that the prosecution had suborned false testimony from Ward because no evidence suggested that the prosecution had promised Ward favorable treatment for his trial testimony. *Id.* 13–14 ¶ 20.

After reviewing the record, the Court cannot conclude that the State court made an unreasonable determination on the prosecutorial misconduct claims. Significantly, trial counsel's description of the relationship between the prosecution and Ward presented to the jury at trial mirrors the description provided the prosecution and Ward at the post-conviction evidentiary hearing. Stated otherwise, trial counsel's reference to a "you scratch my back, I'll scratch your back" arrangement, the prosecution's reference to "a chit in the game," and Ward's confirmation of "an unsaid agreement" consisting of "a wink and a nod" are one and the same. These terms all cover an understanding between the prosecution and Ward that, if Ward testified against Moore

at trial, he would likely receive a more favorable plea agreement. This mutual understanding, which did not include specific terms and was not itself an agreement, was known by trial counsel, who capably relayed it to the jury during opening statements, through cross-examination, and during closing arguments. The record further demonstrates that trial counsel was fully aware of the terms of the bond reduction at the time of a pretrial conference two months before trial. While Moore may understandably believe that the prosecution's relationship with Ward was unfair, the prosecution did not conceal this relationship from him.

For similar reasons, the claim that the prosecution suborned false testimony from Ward also fails. The record contains ample evidence that the prosecution did not promise Ward favorable treatment for his testimony. Moore contends that, even if Ward's testimony to this effect was true in the literal sense, it created a false impression of a material fact, but the context of the testimony proves otherwise. Specifically, the prosecution raised Ward's lack of formal agreement on redirect examination only after trial counsel had impugned Ward's motives for testifying on cross-examination and indicated that attacking Ward's credibility was a key component of the defense strategy during opening statements. The prosecution did not deny or elicit testimony to contradict trial counsel's narrative but instead established a boundary around that narrative with Ward's testimony to show that it went no further. Therefore, the prosecutorial misconduct claims are not a basis for habeas relief.

**B.      Ineffective Assistance of Trial Counsel**

Moore argues that he is entitled to habeas relief because he received ineffective assistance of counsel due to trial counsel's failure to present his grandfather as a witness. He contends that this testimony would have contradicted Ward's testimony that he was with Moore

from the time of the murder to the time when they returned rented plumbing equipment later that morning.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In determining whether counsel's performance was deficient, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotations and citations omitted). This presumption is an important tool to eliminate the "distorting effects of hindsight." *Id.*

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In assessing prejudice under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

At trial, Ward testified that, after Moore shot the victims, Ward drove back with Moore to Moore's residence and that, later that morning, they returned plumbing equipment that Moore's mother had rented.

**Trial Counsel:** You mentioned something about a Roto-Rooter, the morning of July 23rd?

**Ward:** Yeah.

**Trial Counsel:** You helped [Moore] take it back?

**Ward:** Yes, I did.

**Trial Counsel:** What time was that?

**Ward:** Early morning. He had to have it back first thing in the morning, so he could get his deposit.

**Trial Counsel:** Would it be fair to say it was seven a.m.?

**Ward:** Sometime around there.

**Trial Counsel:** So if you had returned the Roto-Rooter back to this place around seven a.m. how long had you been back to the house from this incident on Fall Creek Parkway?

**Ward:** Maybe a couple of hours. Hour and a half.

Trial Tr. 513-14. Moore's mother presented a different timeline, testifying that she had spoken with Moore about the equipment at about 8:00 a.m., told the rental company that it would be a late return, and asked Moore's grandfather to assist Moore with the return. *Id.* at 663. Trial counsel later presented a receipt to show that Moore had returned plumbing equipment at 9:39 a.m. Trial Ex. A.

At the post-conviction relief stage, Moore argued that trial counsel should have presented his grandfather as a witness. At the evidentiary hearing, Moore's grandfather testified that he drove to Moore's residence and arrived there at 8:40 a.m. that morning. Post-Conviction Relief Hr'g Tr., 67:21–22. According to his testimony, Moore was the only person present when he arrived, and Ward pulled behind his car shortly thereafter. *Id.* 67–68. The Court of Appeals of Indiana rejected this claim for lack of prejudice, noting that Ward did not testify that his time with Moore that morning was continuous and uninterrupted and that Moore's grandfather's testimony would not have contradicted Ward's testimony. *See* Mem. Decision 16-17, ¶¶ 25–26.

After reviewing the record, the court cannot find that the State court's determination regarding trial counsel was unreasonable. It might be reasonable to infer from Ward's testimony that Ward remained with Moore until the time the plumbing equipment was returned, but Ward was never squarely presented with that question nor did he make any express representations that he did so. Even if he had, it is unclear how rebutting this testimony would have meaningfully affected the outcome of the case. Moore concedes that this was not a material fact but contends his grandfather's testimony would have generally detracted from Ward's credibility and bolstered Moore's credibility. However, the rental store receipt and Moore's mother's testimony also demonstrated that Ward's account the sequence of events after leaving the scene of the murders was flawed and bolstered Moore's account. Moreover, the effect of this flawed account on Ward's credibility likely paled in comparison to the effect of trial counsel's arguments that Ward rather than Moore had committed the murders or that favorable treatment from the prosecution motivated Ward's testimony.

In sum, the record reflects that trial counsel presented the jury with a vigorous and substantial attack on Ward's credibility. It further reflects that the testimony of Moore's grandfather would have served only to contradict an immaterial fact that was not included in Ward's testimony. Because it is unclear how the absence of Moore's grandfather's testimony prejudiced Moore, the claim that trial counsel should have presented Moore's grandfather as a witness is not a basis for habeas relief.

## C.    Ballistics Evidence

Moore argues that he is entitled to habeas relief because the prosecution presented ballistics evidence obtained in violation of the Fourth Amendment, which the State court incorrectly found to be harmless error. On habeas review, a constitutional error is considered

harmless unless it can be shown to have "had substantial and injurious effect or influence in determining the jury's verdict." *Czech v. Melvin*, 904 F.3d 570, 577 (7th Cir. 2018) (internal quotations and citations omitted). "That is, petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Id.* "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). "In conducting this analysis, we look to a host of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011) (internal quotations and citations omitted).

At trial, the prosecution introduced evidence to show that, on January 25, 2002, a police officer confiscated a handgun from Moore because Moore was involved in a dispute and the police officer believed that it could escalate to violence. Trial Tr. 583–84, 594. The police department tested the handgun by firing it and recorded their results. *Id.* at 607, 613. These results included the unique markings on bullets fired from the handgun that were consistent with the grooves on the inside of the barrel of the handgun. *Id.* at 613, 629. The bullets recovered from the victims' bodies were consistent with the results obtained from Moore's handgun in 2002. *Id.* at 641. The trial court admitted testimony regarding this match against trial counsel's objection that it violated the Fourth Amendment. *Id.* at 595-600. The prosecution also introduced evidence through the testimony of three members of the Bettis family that Moore left the handgun in another person's vehicle but that the handgun was returned to Moore two days before

18

the date of the murder. *Id.* at 680, 693–95, 697, 704–05. In response, Moore testified that he had

not seen the handgun since his home was burglarized in August 2002. *Id.* at 787–89.

On direct appeal, the Court of Appeals of Indiana found that the police officer seized the

handgun in violation of the Fourth Amendment and that the trial court should not have admitted

the ballistics evidence. Op. "Moore v. State" 8–9. However, the appellate court concluded that

the admission of the ballistics evidence was harmless beyond a reasonable doubt, reasoning that

it was not inconsistent with Moore's claim of innocence because Moore claimed that he had not

seen the handgun since August 2002. *Id.* 10. The appellate court also reasoned that the ballistics

evidence was cumulative of testimony from Ward and other witnesses. *Id.*

After reviewing the record, the Court cannot find that the State court's harmless error

determination was unreasonable. To start, the prosecution's case against Moore was strong, if not

overwhelming, even without the ballistics evidence. It included testimony from the victims'

friend demonstrating Moore's interactions with Johnson and his attraction to Johnson, which

Moore confirmed through his own testimony. Trial Tr. 720-27, 792-99. It included telephone

records showing that Coleman, a close friend of Johnson, had called Moore's residence on the

night of their murders. *Id.* at 746, 817; Trial Ex. 89. It also included Ward's testimony that

Moore had committed the murders by shooting the victims because he felt emasculated by his

romantic involvement with Johnson. *Id.* at 453–58, 464.

Considering the record as a whole, it seems unlikely that the ballistics evidence played a

significant role in the jury's determination. The evidence at trial indicated that Moore and Ward,

who were close friends and housemates, were the most likely culprits and forced the jury to

choose between their accounts. The ballistics evidence was unnecessary to establish their

connection with the victims on the night of murders in light of the telephone records. The

19

ballistics evidence also did little to clarify whether Moore or Ward committed the murders or which of their accounts was more credible as housemates would likely have shared access to weapons regardless of ownership. Moreover, even setting aside the inadmissible portions of the ballistics evidence, other witnesses testified that they returned a handgun to Moore days before the murder, and the expert witness would have remained able to identify that the bullets in the victims' bodies were consistent with the type of handgun owned by Moore. The record also contained evidence of Moore's motive to commit the murders but no evidence to suggest a motive for Ward. Consequently, even if the ballistics evidence caused some prejudice, any such prejudice would have been substantially outweighed by the impact of the evidence related to motive. Therefore, the Court cannot find that the admission of the ballistics evidence had a substantial and injurious effect on the jury's decision or that it is a valid basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the Court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  For the reasons explained in this order, there is no basis for encouraging Moore to proceed further.

For these reasons, the Court DENIES the habeas corpus petition [ECF No. 1]; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on March 24, 2021.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT